In the Matter of the Estate of HENRY SHAW, Deceased; ERNST SCHWARZBURG *et al.*, Appellants, v. HENRY SHAW'S Administrator, Respondent.

St. Louis Court of Appeals, November 9, 1892.

1. **Wills, Construction of.** One S. by his will bequeathed certain sums to three persons designated by name, and a certain other sum to every one of his employes who had been in his service for a specified period. He had in his lifetime conducted a botanical garden which belonged to himself, and had also established a public park, vesting the title thereto in the city of St. Louis, and the management thereof in a board of commissioners of which he himself was a life member, acting as comptroller. The funds for the keeping of this park, including the wages of employes at the park, which were supplied by said city, were dispensed by him as such comptroller. *Held*, that the bequest applied only to his own employes, and not to those at the park.

2. ———: LAW AND FACT. *Semble*, that the determination of the scope of said bequest was a question of the construction of the will, which, even when the aid of extrinsic evidence is necessary, is always a question of law for the court.

*Appeal from the St. Louis City Circuit Court.*—HON. DANIEL DILLON, Judge.

AFFIRMED.

*Aug. Rebenack*, for appellants.

*Douglas & Scudder* and *Rowell & Ferriss*, for respondent.

THOMPSON, J.—The late Henry Shaw left a will containing the following clause:

"I give and bequeath to Mr. James Gurney, the head gardener at the Missouri Botanical Garden, the sum of three hundred dollars ($300); to Constance Strobel and Michael Savadil, each the sum of one hundred and fifty dollars ($150), and to my other employes and laborers, who at my decease are and may have been in my service for five years or more, the sum of seventy-five dollars ($75) each."

The three persons named in this clause as special legatees were all of them employed by Mr. Shaw at the Missouri Botanical Garden, and were paid by him, presumably out of his own funds. The plaintiffs in this case consist of twenty-five men, whose claim to $75 each under this clause of the will is based upon the fact, that they were employed during the five years preceding the death of Mr. Shaw in Tower Grove Park, one of the parks of the city of St. Louis. They claim that the relations of Mr. Shaw to Tower Grove Park and to them was such, that they are to be regarded as his employes and laborers under a proper construction of this clause of his will. They accordingly filed a petition or motion in the probate court for an order on the public administrator, in charge of the estate of Mr. Shaw, to pay to each of them the sum of $75; and

the case is such that if, under a proper construction of the above clause of the will, aided by extrinsic evidence such as may be properly considered, it was the intention of Mr. Shaw to include employes and laborers employed in Tower Grove Park, then the petitioners ought to succeed; otherwise not. The probate court allowed their petition, and the public administrator appealed to the circuit court, where their petition was heard anew before the court without a jury. No objection was made to any evidence adduced in the circuit court, and no instructions were asked or given. The circuit court rendered a finding and judgment for the defendant. From this judgment the petitioners appeal to this court.

It appeared in evidence that the three men named in the clause of the will of Mr. Shaw above quoted as special legatees; namely, James Gurney, Constance Strobel and Michael Savadil, were all employed by Mr. Shaw at the Missouri Botanical Garden, commonly known as Shaw's garden, where Mr. Shaw had his residence a portion of the time, which garden Mr. Shaw superintended, paying the men there employed, so far as the record discloses, out of his own funds. It also appeared in evidence that Mr. Gurney, to whom by this clause of his will Mr. Shaw left $300, was not only employed as head gardener by Mr. Shaw at Shaw's garden, but was also employed as "park gardener" in Tower Grove Park. For his services as park gardener in Tower Grove Park he received a separate salary from the park commissioners. It further appeared that some of the petitioners were sometimes employed in Shaw's garden, and that for the services there rendered they were personally paid by Mr. Shaw; but it is not claimed that any of them were employed in Shaw's Garden for five continuous years prior to the death of Mr. Shaw. About thirty men were employed by Mr. Shaw, during

the summer season in Shaw's Garden, and about seventy
men were employed in Tower Grove Park during the
summer season. Tower Grove Park was established
under an act of the legislature, approved March 9,
1867, and some amendments not necessary to consider.
From this statute it appears that Mr. Shaw donated to
the city of St. Louis the ground, of which Tower Grove
Park consisted, upon certain trusts which are set forth
in the statute. It is sufficient for the purpose of the
question under consideration to say that the legal title
to the park was vested in the city; that its government
was vested in a board of commissioners, to consist of
not less than five nor more than seven members, of
which board Mr. Shaw was to be a member during his
lifetime, and after his death his place was to be sup-
plied by whomsoever should be his successor in the
direction of the Missouri Botanical Garden; that a fund
for the management of this park was created by the
issuing of a series of bonds known as the "park bonds
of the city of St. Louis," which bonds were required to
be sold by the mayor of the city or some other person
duly authorized by him, and the proceeds paid over
into the hands of the aforesaid commissioners of Tower
Grove Park. The statute then provided how this
fund should be deposited by the commissioners, how
invested and how disbursed. It also provided for a
scheme of public taxation, to be entered upon after the
expiration of three years from the passage of the act, to
raise a perpetual fund amounting to at least $25,000 a
year for the maintenance of the park. The commis-
sioners of the park were to serve gratuitously, except
that each one was to be allowed $100 a year for his
expenses. The board was required to make annually to
the city council a detailed statement of its receipts and
expenditures. The commissioners were clothed with
all the powers in regard to Tower Grove Park, "which

now is or may hereafter be by law conferred upon or possessed by the corporation of St. Louis in respect to the public squares and places in said city.'' It was made a misdemeanor, to be heard and punished in a summary manner in the circuit court of the city (then county) of St. Louis, for any commissioner to be directly or indirectly in any way pecuniarily interested in any contract or work of any kind whatever connected with the park. Every commissioner was required, before entering upon the duties of his office, to take and subscribe the oath prescribed by the constitution of the state to civil officers.

The evidence shows that the Missouri Botanical Garden, commonly known as Shaw's Garden, adjoins Tower Grove Park, and that the bell habitually rung at Shaw's Garden to designate the hours of labor also guided the laborers employed in Tower Grove Park. It also shows that many of the petitioners were personally employed by Mr. Shaw as laborers in Tower Grove Park; that is to say, they would apply to him for a job, and he would direct the superintendent of the park to employ them if there was any need for their services. It also appeared that Mr. Shaw acted as president of the board of commissioners of Tower Grove Park, and as comptroller of the fund in the possession of the commissioners of the Park under the statute as already recited. The manner of employing the hands employed in Tower Grove Park for several years previous to the death of Mr. Shaw is described by Mr. Kaime, who was paymaster for the commissioners of the park. The men were paid in cash twice a month in summer, and once a month in winter. The method of payment was that Mr. Shaw would draw a check, as comptroller of the park fund, upon the bank in which the park fund was deposited; that Mr. Shaw also made out an account or pay-roll, and after foot-

ing it up gave to the treasurer a check for the amount, always signed "Henry Shaw, comptroller." The treasurer then got the money from the bank, took it out to the park, and there paid the men in a little office kept for that purpose. Payment was made from a book in which was kept a list or record of all the names of men employed in the park, the number of days' work, the price per day, and the total amount due to each one at each pay day. This book was made up from a record kept by the foreman of Tower Grove Park, and given to Mr. Shaw, which the latter copied or caused to be copied into the book.

This evidence seems to throw the controversy into a very clear light. Mr. Shaw, as Mr. Kaime testifies, and this is the testimony of all the witnesses so far as they speak on the matter, carried on Shaw's Garden personally, personally employed the men that were employed, personally made out their accounts, and personally paid them up to the latest period of his life. He paid them "in his house in the Garden." On the other hand, a board of commissioners established under an act of the legislature of which Mr. Shaw was president and of whose funds he was comptroller, which funds were furnished by the city of St. Louis, and were raised by public taxation, managed Tower Grove Park. The legal title to that park was in the city of St. Louis. It was an institution of the city of St. Louis, like its other public parks. The connection of Mr. Shaw with it was merely an official connection. He was *ex officio* a life member of the board of commissioners to which its management had been committed. He was required, in that character, to take the oath of office prescribed by the constitution for civil officers of the state. He was liable to a penalty, like the other commissioners, in the event of being personally interested in any public contract relating to the park. Though he employed

men, and in many cases these petitioners, to serve in the park, yet it is clear that he employed them in his character as president of the board, that is, in his character as a public officer. It is equally clear that the part which he had in paying them was simply the part of a public officer,—the accountant of a public fund,—in disbursing that fund to the persons entitled to receive it.

Such being the undisputed facts, it seems very plain to us that the circuit court was right, and that the hands employed in Tower Grove Park were not in the contemplation of Mr. Shaw his employes and laborers when he drew the clause of his will above quoted. This conclusion is strengthened by the reflection, that the three men whom he made special legatees in that clause were old employes of his in Shaw's Garden, although one of them was also employed by the park commissioners, for which he received a separate salary; and that it may readily be supposed that, out of the seventy men employed during the summer season in Tower Grove Park, there must have been men who had rendered long services, and who were equally deserving with some of these special legatees, who would have been thought of by Mr. Shaw and specially mentioned, if he had intended to extend this part of his bounty to those employed in the park. The principle, *noscitur a sociis*, while not always a very strong or decisive principle of statutory construction, seems to come into play here, and to point easily to the conclusion, in connection with the other facts, that Mr. Shaw did not intend to extend this bounty to other employes than those employed in his botanical garden.

We have not thought it necessary to consider the question, urged upon us in behalf of the public administrator, that the circuit judge tried this case sitting as a jury, and that for that reason his finding is conclusive

upon us; for the reason that, if we were dealing with it as chancellors, our conclusion would be the same as that of the circuit judge. It seems to involve primarily the construction of the will of Mr. Shaw. The essential inquiry seems to be, what was the intention of the testator, and we understand the rule to be that this is always a question for the court, and never a question for a jury, even in cases where the aid of extrinsic evidence is necessary for its solution. The case is quite different from the case where the question of the proper construction of the will being determined, the issue is whether a particular person is entitled to take under the will as thus construed. If, for instance, these petitioners had been men employed by Mr. Shaw in his botanical garden, and if the issue had been whether they were there employed for five years previous to the death of Mr. Shaw, that might have been a question for the jury, because that would be a question of fact not involving an interpretation of the will. The case seems to be like the well-known case, where the true construction of the deed being determined by the court, the application of its calls to the land is a question for the jury. But we need not dwell upon this, because, under either view of our powers in dealing with the facts, our conclusion would be the same,—that the circuit court was right in rendering judgment against the petitioners.

The judgment is accordingly affirmed. All the judges concur.